**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4656

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

PEDRO GUTIERREZ, a/k/a Magoo, a/k/a Light, a/k/a Inferno,

Defendant – Appellant.

No. 18-4665

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAMES BAXTON, a/k/a Grown, a/k/a Frank White,

Defendant – Appellant.

No. 18-4855

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

CYNTHIA GILMORE, a/k/a Lady Bynt, a/k/a Cynthia Young,

        Defendant – Appellant.

------

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Chief District Court Judge. (3:17-cr-00134-FDW-DSC-21; 3:17-cr-00134-FDW-DSC-5; 3:17-cr-00134-FDW-DSC-19)

------

Submitted: March 26, 2020                      Decided: June 26, 2020

------

Before WILKINSON, AGEE, and THACKER, Circuit Judges.

------

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.

------

Jorgelina E. Araneda, ARANEDA LAW FIRM, Raleigh, North Carolina, for Appellant Pedro Gutierrez. Matthew C. Joseph, LAW OFFICE OF NORMAN BUTLER, Charlotte, North Carolina, for Appellant James Baxton. Aaron E. Michel, Charlotte, North Carolina, for Appellant Cynthia Gilmore. R. Andrew Murray, United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

------

AGEE, Circuit Judge:

Pedro Gutierrez, James Baxton, and Cynthia Gilmore (collectively "Appellants") appeal various rulings of the district court following their convictions and sentences. Finding no reversible error, we affirm.

I.

Appellants are members of United Blood Nation ("UBN"), an east coast gang that is governed by a common set of rules, has a strict hierarchical structure, and is composed of tightly controlled sets. The relevant set here is the Nine Trey Gangsters, of which Gutierrez is the leader, or "godfather." He is also the chair of the UBN council, which the Government described as "the governing body of all Bloods on the East Coast."[1] J.A. 1503. Immediately below Gutierrez in the Nine Trey's leadership hierarchy is Baxton. During the relevant time period, Gutierrez and Baxton were incarcerated in the New York Department of Corrections.

During the same period, Gilmore had a leadership role with a Nine Trey set in North Carolina and served as a liaison between Gutierrez and UBN members in North Carolina for the direction and guidance of UBN gang activities.

---

[1] As the Government summarized Gutierrez's position at trial, "[i]n the Bloods organization no one is above him. No one is more powerful than him. [H]e's the CEO of the Bloods." J.A. 1503.

3

In March 2018, a federal grand jury in the Western District of North Carolina indicted Appellants and eighty other UBN members on various charges including conspiracy to engage in a pattern of racketeering activities, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). [2] The racketeering activities described in the indictment were numerous, including multiple acts involving murder and robbery, use or carry of a firearm during and in relation to a crime of violence, assault with a dangerous weapon, possession with the intent to distribute illegal narcotics, possession of a firearm by convicted felons, wire fraud, identity theft, and bank fraud.

As leaders of UBN, Appellants ordered, guided, or actively participated in these racketeering activities. For instance, Gutierrez ordered the Nine Trey to engage in an "all out war" against a North Carolina gang, Pretty Tony, and directed Nine Trey members to kill Pretty Tony members who did not join the Nine Trey. J.A. 2123. Gutierrez's order led to numerous fights and stabbings in prisons, causing five prisons to go on lockdown, as well as shootings outside of prison. Similarly, Baxton ordered the Nine Trey to attack Jarrod Hewer, the godfather of another UBN set, for plotting to remove Gutierrez from his UBN leadership position. As a result, Hewer was attacked and stabbed several times by UBN members while incarcerated. For her part, Gilmore provided funds necessary to

---

[2] Seventy-two indictees pleaded guilty; four were found guilty after a separate jury trial from the Appellants' trial; and one was found guilty in a separate bench trial. Of the remaining three, the Government moved to dismiss the indictments for two individuals, and one remains a fugitive.

facilitate these criminal activities by engaging in tax fraud. She gave stolen personal information to Margo Lewis and had her file fraudulent tax returns using that information. Lewis then directed tax refunds generated by those fraudulent returns to be deposited into a bank account of Gilmore's choice.

Appellants proceeded to a jury trial and were all found guilty of the RICO conspiracy. Following the jury's verdict, the district court sentenced Gutierrez and Baxton to 240 months' imprisonment and Gilmore to 228 months' imprisonment.

Appellants timely appeal their convictions and sentences. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Appellants raise numerous issues on appeal, and we address each argument in turn.

A.

First, Appellants challenge the district court's decision to empanel an anonymous jury. A month prior to the start of trial, the Government moved to empanel an anonymous jury, citing the danger UBN could pose to the jury and the high media attention to this case. The Government highlighted that UBN obstructed justice in another UBN prosecution by abducting a prosecutor's father and killing a witness and his wife. Appellants opposed the motion, contending that their circumstances were indistinguishable from other criminal defendants who were tried with a regular jury and that they specifically did not pose any threats to jurors in this case. The district court disagreed, granted the Government's motion,

5

and ordered the names of the jurors could be given only to Appellants' counsel, who were prohibited from revealing those names to their clients and others. The court explained that "for purposes of security, [the court] ha[d] to err on the side of caution," and it "need[ed] to take reasonable security methods, and . . . make sure there's reasonable safeguards as to the prejudice against the defendant." J.A. 1455.

On appeal, Appellants argue that the district court erred because they did not pose any threats to jurors and its decision prejudiced the jury against them. As a result, they assert they were deprived of a fair trial by an impartial jury.

We review the district court's decision to empanel an anonymous jury "under a deferential abuse-of-discretion standard," *United States v. Dinkins*, 691 F.3d 358, 371 (4th Cir. 2012), and hold that the district court did not abuse its discretion in this case. Although "[t]he decision to empanel an anonymous jury and to withhold from the parties biographical information about the venire members is, in any case, an unusual measure," "[a] federal district court may empanel an anonymous jury in any non-capital case in which the interests of justice so require." *Id.* at 372 (internal quotation marks omitted). An anonymous jury is warranted if two conditions are present: "(1) there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity; and (2) reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed." *Id.* The district court found both conditions existed here, and we agree.

Courts may assess whether "strong reasons" for an anonymous jury exist by considering the five *Ross*[3] factors:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.* at 373 (quoting *Ross*, 33 F.3d at 1520). "[T]he presence of any one factor or set of factors [does not] automatically compel a court to empanel an anonymous jury" because the list of factors is only "instructive" and not "exhaustive." *Id.*

In considering the *Ross* factors, "a district court must always engage in a context-specific inquiry based upon the facts of the particular case before the court." *Id.* In non-capital cases like this one, the district court's findings "need not have been based on evidence already in the record at the time the decision was made, and may be upheld on appeal in light of the evidence ultimately presented at trial. However, [the findings] must rest on something more than speculation or inferences of potential risk." *Id.* at 374 (internal citations omitted).

---

[3] The factors are attributed to *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994), in which the Eleventh Circuit instructed its courts to consider "several factors," including these five factors, in finding sufficient reason for empaneling an anonymous jury. *Id.* at 1520. We used the *Ross* factors in *Dinkins* "because they are drawn from significant judicial experience addressing the propriety of decisions whether to order anonymous juries." *Dinkins*, 691 F.3d at 373.

In this case, the district court held that the *Ross* factors indicated strong reasons for an anonymous jury. We agree. The facts here are substantially similar to those of *Dinkins* and *United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019), where we concluded that the *Ross* factors supported empaneling an anonymous jury. *Dinkins* involved defendants who were members of a drug organization that had committed shootings and murders. We held that by "virtue of their association with" the organization, the defendants "belonged to a group involved in organized criminal activity," and that organization "had the capacity to harm jurors" because "other members of the group, who were not in jail, remained capable for interfering with the judicial process." 692 F.3d at 375. Furthermore, "the defendants previously had engaged in attempts to interfere with the judicial process," and were currently "charged with murdering government informants and witnesses." *Id.* at 375–76. Moreover, there was "evidence of similar uncharged conduct." *Id.* at 375. Given their criminal conduct, the defendants faced "a potential death sentence or a term of life imprisonment," which gave them an incentive "to resort to extreme measures in any effort to influence the outcome of their trial." *Id.* at 376 (internal quotation marks omitted). After discussing these factors, the *Dinkins* court did not address the last *Ross* factor—whether the defendants' trial would result in extensive publicity—because the record did not indicate whether that had occurred or would likely occur. *Id.* Accordingly, we found strong reasons for seating an anonymous jury based on the four applicable *Ross* factors.

Similar to *Dinkins*, *Mathis* involved defendants who were gang members and presented circumstances that satisfied at least three *Ross* factors, which we held were

8

sufficient to empanel an anonymous jury. 932 F.3d at 252–54. There, the defendants were "members of a violent street gang and were involved in a number of violent criminal offenses, including witness tampering by murder," had "associates who were not incarcerated and could intimidate or harm the jurors," and, if convicted, would receive "lengthy incarceration and substantial penalties that may have induced them to intimidate the jury." *Id.* at 253.

As in *Mathis* and *Dinkins*, this case involves strong reasons supporting an anonymous jury. Appellants are leaders of UBN and had individually and corporately committed numerous violent crimes listed in the indictment. UBN has members who are not incarcerated and are capable of harming jurors, as demonstrated by their murder of a government witness and his wife in another North Carolina UBN case. Furthermore, Baxton attempted to interfere with the judicial process by directing a UBN member to make false statements to law enforcement. As a result of the crimes charged, Appellants faced lengthy incarceration of up to 20 years' imprisonment and substantial monetary penalties. Based on these facts, we conclude that the *Ross* factors weighed in favor of an anonymous jury and that the district court acted properly in seating such a jury.

After finding the first condition for seating an anonymous jury was satisfied, we turn to the second condition—that is, whether "reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed." *Dinkins*, 691 F.3d at 372. We hold that this condition was also satisfied, as the district court properly adopted appropriate reasonable safeguards by instructing the venire as follows:

9

We want to ensure that you will remain anonymous so you will not be contacted by anyone in the media and ensure that no outside information is communicated to any juror throughout the jury selection process and the trial. This is so that each side can have a fair and impartial trial. The fact that we are identifying you by number should have no impact at all on the presumption of innocence that the defendants are entitled to or any impact in any other way as you consider and decide the case if you were selected on the jury.

J.A. 1456. By providing this instruction, the district court gave the jury "a neutral non-prejudicial reason for empaneling an anonymous jury." *United States v. Hager*, 721 F.3d 167, 188 (4th Cir. 2013). And we have approved a similar measure in *Hager*, 721 F.3d at 188–89, as "the generally accepted practice for minimizing prejudice, which is to downplay (not accentuate) the significance of the juror anonymity procedure." *Dinkins*, 691 F.3d at 379 (internal quotation marks omitted). "[B]ecause the district court properly instructed the jury on the presumption of innocence," "any remote possibility of harm was mitigated further." *Id.* Accordingly, we hold that the two necessary conditions for empaneling an anonymous jury—protecting the jury from harm and minimizing prejudice to the accused—were satisfied.

Nonetheless, Appellants argue that empaneling an anonymous jury prejudiced them and, in support, point to the jury's inquiry to the district court on the second day of trial. That day, the jury asked the district judge, "[w]ould it be possible to speak with the Judge or a member of the safety security regarding an area of concern for jurors' safety?" J.A. 4939. The jurors' parking arrangement during trial gave rise to this concern, as they parked across the street from the courthouse during the trial. While jurors crossed the street, Appellants' family members or gang members could see their license plates or follow them.

10

However, the jury raised this issue only after they began hearing the evidence and learning the nature of the charges and the identity of Appellants, not before they were empaneled as an anonymous jury. The timing of this concern shows that it bears no relation to the functioning of an anonymous jury, and Appellants do not provide any evidence to show otherwise. "Without any evidence to the contrary, we must assume that the jury followed the instructions [on the presumption of innocence] given to it by the court." *Hager*, 721 F.3d at 189. Therefore, we find Appellants' argument without merit.

B.

Next, Appellants challenge the district judge's decision not to recuse himself from presiding over this case. The day before jury selection began, Gilmore moved to recuse District Judge Frank D. Whitney, citing to the judge's recusal in an earlier trial of another UBN member. In that case, Judge Whitney's picture was found in a defendant's cell, leading him to recuse in that case. Gilmore argued that Judge Whitney should do the same here because recusing himself from one UBN trial and not from the other would be "inconsistent." J.A. 1464. The district court disagreed, holding that in the prior case:

> an indicted defendant's cell was searched by the FBI, and there was a picture of . . . me.
> So my picture is found in a cell of a named defendant. I think that's -- there's nothing like that in this case, absolutely nothing. I've had no threats or anything that I'm aware of that have any impact on my ability to adjudicate this case.

J.A. 1464–65. Furthermore, the court expressed being "nervous about recusing in that case because I knew it could create this very precedent that I'm going to -- you can get rid of me by getting my picture," which, in turn, would encourage "[j]udge shopping." J.A. 1466.

11

The district court followed up with a written order, reiterating the grounds not to recuse. The court explained that Gilmore's case was distinguishable from the previous UBN case because the judge did not face any similar threats from Appellants, the link between this case and the previous case was attenuated, no basis for questioning his impartiality existed, and recusal would inappropriately encourage judge shopping.

On appeal, Appellants argue that the district judge's decision not to rescue himself was error, asserting that the judge's decision would confuse the public and presents grounds to question his mental state. Reviewing the recusal decision for abuse of discretion, *United States v. Stone*, 866 F.3d 219, 229 (4th Cir. 2017), we find none. Appellants do not provide any basis for us to find the risk of confusing the public or to question the district judge's impartiality and mental state, except that he recused himself from an earlier trial of another UBN member unrelated to the case at bar. But as the judge properly noted, that case is distinguishable from Appellants' case because his photo was found in the defendant's cell, and there is no comparable evidence here. We therefore conclude that the district court did not abuse its discretion in denying recusal.

C.

Appellants also assign error to several aspects of the jury selection process. "We review the district court's decisions to seat these jurors for abuse of discretion, and we will find abuse only where a per se rule of disqualification applies or where the trial court demonstrated a clear disregard for the actual bias of the juror." *United States v. Umana*,

12

750 F.3d 320, 338 (4th Cir. 2014) (internal citation, quotation marks, and alterations omitted). Finding no abuse here, we affirm the district court's decisions.

1.

Initially, Appellants contend the district court abused its discretion by permitting the Government to use the term "gang"[4] in describing UBN to prospective jurors, which unfairly prejudiced the venire against them. But they fail to provide any controlling legal authority that prohibits the use of this term. On the contrary, we have used the term "gang" in similar prior decisions involving UBN. *See United States v. Melton*, 761 F. App'x 171, 172 (4th Cir. 2019) (defining UBN as "an east coast gang"); *United States v. Brown*, 610 F. App'x 236, 237 (4th Cir. 2015) (labeling UBN a "gang"). Not only is use of the term "gang" factually accurate and supported by the record, but in the RICO context, that usage effectively translates the RICO statutory language into terms a non-lawyer jury can readily comprehend. *United States v. Rios*, 830 F.3d 403, 423 n.7 (6th Cir. 2016) (holding that in a RICO conspiracy trial, "use of the term 'gang' to describe the Latin Kings and the Holland Latin Kings was appropriate as the existence of the enterprise and conspiracy was very much at issue. At a minimum, it was not an abuse of discretion to allow the term to be used."). Thus, we do not find any abuse of discretion in permitting the use of the term "gang."

2.

---

[4] Counsel for Gutierrez and Gilmore objected to this term in the district court, but their objection was overruled because Appellants were "admitted gang members." J.A. 4790.

Next, Gilmore points to a jury administrator's misidentification of two jurors that occurred during the jury selection process. After fifteen jurors were seated, the district court and the parties realized that the jury administrator had mistakenly switched the juror questionnaires of Jurors 33 and 168, identifying the questionnaire of Juror 168 as that of Juror 33 and vice versa. As a result, defense counsel used the questionnaire of Juror 168 to strike Juror 33. However, this mistake did not affect any jurors other than Jurors 33 and 168.

Gilmore, later joined by Baxton and Gutierrez, argued that this mistake warranted a mistrial, asserting that they would not have stricken Juror 33 based on that juror's actual responses to the questionnaire. The district court denied the motion, holding that any error was harmless given that the decision not to seat one juror was not "outcome determinative," and Appellants' argument was speculative. J.A. 4883.

On appeal, Gilmore asserts that the district court abused its discretion by not declaring a mistrial and restarting the jury selection because she could not verify that only two jurors had mismatching juror questionnaires, and this mistake tainted the entire process. That argument is contradicted by the record, which shows that after learning of the mistake, the district court promptly corrected it, informed the jurors of what occurred, and verified with each one, including Juror 168, that their juror questionnaires were correctly numbered. This verification process took place in the presence of Appellants' counsel, which assured them that no other mistake had occurred. Moreover, the court cured any prejudice that might have transpired from this mistake by removing one preemptory strike from the

14

Government.[5] It also granted Appellants an additional preemptory strike and allowed them to use it against any of the jurors including those already seated. The district court thus did not abuse its discretion regarding the juror questionnaires.

3.

Appellants also challenge the Government's preemptory strike of Juror 105, who indicated on the juror questionnaire that he had "an unpleasant or bad encounter with a law enforcement officer" because he had been detained and "asked repeatedly if [he] had weapons." J.A. 4822. Gilmore objected to striking Juror 105, but the district court overruled the objection, finding a legitimate reason for the strike. Although Appellants argue on appeal that this ruling shows the district court's bias in favor of the Government, there is no record evidence to support that claim. We have held that the Government may strike a potential juror based on his "dissatisfact[ory] [experience] with the police," *United States v. Campbell*, 980 F.2d 245, 249 (4th Cir. 1992), because that experience demonstrates "bias [against] law enforcement officials," which is "inappropriate," *United States v. Lancaster*, 96 F.3d 734, 743 (4th Cir. 1996).

4.

---

[5] The district court and the parties considered bringing back Juror 33 to the jury pool, which would have delayed the jury selection process. The Government asserted that measure was not necessary because if Appellants had not stricken Juror 33, it would have used a preemptory strike and stricken the juror based on the correct juror questionnaire. Assuming this had occurred, the Government agreed to relinquish one preemptory strike. The district court accepted the Government's concession and decided not to bring back Juror 33.

Lastly, Appellants argue the district court abused its discretion in granting the Government's motion to strike Juror 165 but denying the motion to strike Juror 131. The district court found cause to strike Juror 165 because she did not truthfully disclose her negative experience with law enforcement in her juror questionnaire and then told the court that the justice system "doesn't work." J.A. 4858–59. In contrast, the court did not find cause to strike Juror 131 because although he "had some problems with the system, [he] then made it clear that [he] can follow the law." J.A. 4860. Juror 131 agreed that "the system worked," and did not think "that the system is not fair to some kinds of people in particular." J.A. 4861. Thus, Juror 131's opinion of the criminal justice system differed substantially from that of Juror 165.

"The trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of demeanor evidence and of responses to questions." *United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996) (internal quotation marks omitted). As a district judge "is in the best position to make this determination, the inquiry [into a potential juror's bias] is committed to his discretion, including ample leeway to formulate the questions to be asked." *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019). "Just as the trial judge has latitude in framing the inquiry, so too does he have broad discretion in evaluating the significance of potential juror bias." *Id.* at 835.

Under this deferential standard of review, we hold that the district court did not abuse its discretion by inquiring into any potential bias of Jurors 131 and 165 or deciding

on the motions to strike them. By inquiring of the potential jurors about their experience with law enforcement and their views on the criminal justice system, the district court was simply "prob[ing] the prospective jurors for bias and partiality," *Lancaster*, 96 F.3d at 742, and gauging whether they "would be unable to faithfully and impartially apply the law," *Wainwright v. Witt*, 469 U.S. 412, 426 (1985).

Based on the potential jurors' responses to its questions, the district court granted the motion to strike Juror 165 because her bias against the criminal justice system "suggested [she] could not be fair and impartial." *Smith*, 919 F.3d at 835. This decision shows that the court "made reasoned judgments in walking the line between detecting bias and creating bias. And we are not here to micro-manage those considered choices." *Id.* at 834. Accordingly, we hold that the district court did not abuse its discretion in deciding not to seat Juror165 and to seat Juror 131.

## D.

Next, Gilmore challenges the denial of her motion to suppress her cellphone and its contents. We review the district court's "legal determinations *de novo* and factual findings for clear error. Where, as here, the government prevailed below, we construe the evidence in the light most favorable to the government." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (internal citation and quotation marks omitted).

In the early morning of August 10, 2011, three UBN members invaded a home in Raleigh, NC, and shot one person. When the police responded to the shooting, UBN member Hakim Jacobs fled on foot and contacted Gilmore. Although she did not

17

participate in the actual robbery, Gilmore picked up Jacobs in her car. As they drove away, two Raleigh Police Department officers, Ross Weatherspoon and Brandon Johnson, stopped Gilmore's car and noticed Jacobs in the back seat. Gilmore and Jacobs were detained for further investigation, and Gilmore's cellphone was seized.

Before trial, Gilmore moved to suppress the phone and its contents. She argued that the police did not have reasonable suspicion to stop her and that the cellphone did not belong to her. A magistrate judge conducted a suppression hearing at which Officer Weatherspoon testified that he received a radio transmission about the home invasion at approximately 4:00 a.m. and was given the description of Jacobs, who had fled on foot. To locate Jacobs, Weatherspoon and Johnson stood on the side of the access roadway to the neighborhood to check vehicles entering or leaving. The officers spotted Gilmore's vehicle as it attempted to exit the neighborhood. Gilmore's car was the sole vehicle on the road, and Weatherspoon had not observed any other cars leaving or entering the neighborhood since setting up the perimeter checkpoint.

Johnson approached the driver's side of Gilmore's vehicle and Weatherspoon approached the passenger side. Weatherspoon saw "a black mass in the back seat of the vehicle that [he] later identified to be a person," which "alerted [his] suspicion," because "[t]he person who was hiding in the backseat matched the description of the person who fled." J.A. 1137–38. The person hiding in the backseat was in fact Jacobs, who the officers noticed "was nervous," "was sweating profusely from his forehead at the time," and "was breathing heavily." J.A. 1138.

Johnson testified that the officers detained Jacobs and Gilmore for transport to the police station for further investigation. As standard procedure before transport, the officers removed all items from Gilmore, including her cellphone. But at the suppression hearing, the officers could not specifically recall seizing the cellphone because six years had passed since the seizure. Thus, the Government provided the testimony of other witnesses to document the seizure and demonstrate Gilmore's ownership of the phone. FBI Agent Pupillo testified that Gilmore's cellphone was transferred to FBI custody, and a search warrant was executed on that phone. The subsequent examination of the phone "revealed a connection to the email address 'cynthiagilmore75' as well as other self-identifying information relating to [Gilmore.]" J.A. 1186. Gilmore never reclaimed the phone.

Based on the evidence presented, the magistrate judge recommended denying Gilmore's motion to suppress because Weatherspoon and Johnson had reasonable suspicion to stop her vehicle, had probable cause to arrest her, and lawfully seized her cellphone incident to the arrest. Gilmore objected to the report and recommendation, but the district court overruled her objection and adopted it. On appeal, Gilmore contends that the stop of her vehicle was illegal and no evidence shows her ownership of the cellphone. We disagree.

Under Fourth Amendment caselaw, "an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). We assess the validity of a stop based on "the totality of the circumstances" and "give due weight to common

19

sense judgments reached by officers in light of their experience and training." *Id.* Here, the totality of the circumstances supports the officers' reasonable suspicion to stop Gilmore's vehicle. Approximately twenty minutes after Jacobs fled on foot, the police noticed Gilmore driving away from the neighborhood where the robbery occurred. At the time of the stop, Gilmore's car was the only car on the road. Once the stop lawfully took place, the officers immediately noticed Jacobs in the back seat of Gilmore's car and realized that he was the fleeing suspect. This gave the officers probable cause to arrest Gilmore and Jacobs. *See United States v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010) (holding a warrantless arrest is permissible if "there is probable cause to believe that a criminal offense has been or is being committed. . . . [P]robable cause exists when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." (internal citation omitted)).

After the officers arrested Gilmore, they properly searched her and seized the cellphone incident to her arrest. This seizure was lawful under the Fourth Amendment, which "permits warrantless searches incident to custodial arrests." *United States v. Edwards*, 415 U.S. 800, 802 (1974). "Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial." *Id.* at 803–04.

Despite this straightforward application of Fourth Amendment principles, Gilmore argues that the cellphone and its contents were inappropriately admitted into evidence because there was insufficient evidence to authenticate it as hers. The record shows otherwise. Under Rule 901(a) of the Federal Rules of Evidence, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "The factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury. . . . [And] [t]he burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). Here, the Government made the required prima facie showing. Detective Eric Gibney, who investigated the home invasion and shooting, interviewed Gilmore during the investigation and identified the cellphone during the suppression hearing. Gibney testified that he contemporaneously placed a yellow sticky note with Gilmore's name on her cellphone and that the Government's picture of the cellphone was accurate. In addition, Detective Michael Sardelis, who examined the cellphone, stated that the phone was registered with the email account Cynthiayounggilmore@yahoo.com, multiple messages called the owner "Cynt," and the owner of the phone's birthdate matched that of Gilmore. Given this evidence, we hold that the Government properly

authenticated the phone and its contents, and the district court did not err in admitting them into evidence. The district court thus properly denied Gilmore's motion to suppress. [6]

E.

Appellants argue the evidence was insufficient to support the jury's finding that they were each guilty of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). To convict, the Government had to prove:

> that an enterprise affecting interstate commerce existed; that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.

*United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (internal quotation marks and alteration omitted). We must sustain a jury verdict "when there is substantial evidence, construed in the light most favorable to the government, supporting the verdict." *Mathis*, 932 F.3d at 258.

---

[6] In addition, Gilmore challenges two evidentiary rulings, which we review for abuse of discretion. *United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014). She first argues that the court erroneously excluded the 22-year-old misdemeanor criminal record (as a minor) of an FBI agent who testified for the Government. We disagree. The record was not admissible under Rule 609(b) of the Federal Rules of Evidence because "more than 10 years ha[d] passed since the witness's conviction" and its probative value did not substantially outweigh its prejudicial effect. Fed. R. Evid. 609(b).

Next, Gilmore argues that *Crawford v. Washington*, 541 U.S. 36 (2004), barred the admission of various witnesses' testimony, documents, and emails because they contain hearsay information. We have reviewed the record and hold that *Crawford* does not apply here because none of the challenged evidence is testimonial. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Crawford*, . . . the Confrontation Clause has no application to [nontestimonial out-of-court] statements and therefore permits their admission even if they lack indicia of reliability."). Accordingly, the district court did not abuse its discretion in rejecting Gilmore's *Crawford* argument.

At trial, the Government presented numerous former and current UBN members who testified as to Appellants' leadership authority in UBN and directives to them to engage in criminal racketeering activities. The Government also submitted the call records and text messages between Appellants and other UBN members showing Appellants' threats, warnings, and directives, as well as evidence of criminal activities, such as gang dues derived from drug trafficking and paid into Gutierrez's and Baxton's prison commissary accounts.

On appeal, Appellants challenge an extensive list of the foregoing evidence presented during trial. In essence, they argue either that the evidence did not connect them directly to the criminal activities committed by other UBN members or that they simply did not direct or participate in the alleged criminal activities, including murder, drug trafficking, tax and wire fraud, and robbery. The record does not bear out Appellants' claims.

As the party "challenging on appeal the sufficiency of the evidence," Appellants "bear[] a 'heavy burden,' and must show that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. A conviction will be reversed for insufficient evidence only in the rare case when 'the prosecution's failure is clear.'" *United States v. Hamilton*, 699 F.3d 356, 361–62 (4th Cir. 2012) (internal citations omitted).

Appellants fail to meet their heavy burden because their argument does not show a clear prosecutorial failure, but mere disagreement with the jury's findings. "[A]ny recalling

of the facts by [Appellants] or any inferences drawn from the evidence or suggestions of inferences by [Appellants] were not binding upon the jury" because "the jury was the final arbiter of the facts." *United States v. Browning*, 390 F.2d 511, 514 (4th Cir. 1968) (internal quotation marks omitted). As the record shows substantial evidence supporting the jury verdict, we discern no error in the sufficiency of the evidence.

F.

Appellants also contend the district court erred in not issuing a special jury verdict form that would require the jury to indicate specific racketeering activities each Appellant conspired to commit. As the district court explained when denying the request, this form would have required "enumerat[ing] . . . 50 racketeering predicate acts and they check off the ones they find[.]" J.A. 3442. The district court concluded this request was unnecessary because "the vast majority of courts just have a general verdict form. . . . [A] special verdict form requiring enumerating the predicate acts could be very, very confusing for the jury in this case because of the . . . expansiveness of the criminal acts up and down the Eastern Seaboard." J.A. 3443. Instead, "[t]he important thing is that jurors are told that their decision has to be unanimous." J.A. 3443.

We have previously observed, "as a general matter, there has been a presumption against special verdicts in criminal cases. [And] whether to use a special verdict form is a matter of the district court's discretion." *Udeozor*, 515 F.3d at 271 (citations and internal quotation marks omitted) (alteration in original). Here, the district court exercised its discretion and chose not to use a special verdict form but instead to instruct the jury that its

24

"verdict must be unanimous as to which type or types of predicate racketeering activity [Appellants] agreed would be committed." J.A. 3535. This decision was consistent with our precedent that holds, "for a RICO conspiracy charge the jury need only be unanimous as to the types of racketeering acts that the defendants agreed to commit. . . . [N]o instruction as to the commission of specific acts was required." *United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015). Therefore, the district court did not abuse its discretion in refusing to issue a special jury verdict form.

G.

Gilmore separately appeals two district court decisions on jury instructions: (1) the court's denial of her request to issue a statute-of-limitation instruction and (2) the decision to instruct the jury on two federal crimes in connection with her tax fraud scheme. First, she challenges the district court's denial of her request for a statute-of-limitation instruction. She contends that she withdrew from the RICO conspiracy and that based on her withdrawal, the statute of limitations had expired.

"Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until [s]he withdraws. A defendant who withdraws outside the relevant statute-of-limitations period has a complete defense to prosecution." *Smith v. United States*, 568 U.S. 106, 107 (2013). "Establishing individual withdrawal was a burden that rested firmly on the defendant regardless of when the purported withdrawal took place." *Id.* at 110.

25

In the district court, Gilmore argued that she withdrew from the RICO conspiracy by becoming an inactive UBN member. To support her argument, she pointed to her statement to the arresting FBI agent, "I'm a Blood, but I haven't done anything in a while." J.A. 2620. The court disagreed with Gilmore's contention, holding that her conduct did not show "affirmative withdrawal from the conspiracy," J.A. 3446, and "there is really no evidence whatsoever of withdrawal," J.A. 3447. For that reason, it rejected Gilmore's request to instruct the jury on the question of her withdrawal.

"[W]e review a district court's refusal to give a jury instruction for abuse of discretion," *Mouzone*, 687 F.3d at 217 (citation omitted), and conclude that the district court did not abuse its discretion in deciding that Gilmore had not come forward with evidence to support giving an instruction about withdrawal. Her claim of inactive UBN membership does not constitute withdrawal because "[o]nce it is proven that a defendant was a member of the conspiracy, the defendant's membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." *Cornell*, 780 F.3d at 632 (internal quotation marks omitted). Because Gilmore proffered no affirmative acts of withdrawal and pointed solely to her statement to the arresting officer to support her contention, the district court properly found that her participation in the RICO scheme continued.

Next, Gilmore challenges the jury instruction on identity theft, in violation of 18 U.S.C. § 1028, and bank fraud, in violation of 18 U.S.C. § 1344. The district court instructed the jury to consider these two crimes in connection with the tax fraud scheme in

which she engaged. The evidence at trial showed that in 2010 and 2011, Gilmore provided stolen personal information, such as names, social-security numbers, and dates of birth, to Margo Lewis. Using the information provided, Lewis electronically filed fraudulent tax returns and directed tax refunds to be deposited in bank accounts designated by Gilmore.

In the district court, Gilmore contended that the jury instruction was erroneous because the fraud scheme could not violate more than one criminal statute and must be tried under the bank fraud statute only. The court rejected the argument because the same acts could violate more than one criminal statute. *See United States v. Batchelder*, 442 U.S. 114, 123–24 (1979). On appeal, however, Gilmore makes a new claim that bank fraud and identity theft do not constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1). Because this is a new argument Gilmore did not raise in the district court, we review it for plain error. *Carthorne*, 726 F.3d at 510.

We find no error here (plain or otherwise) because the relevant statutory definitions do not support Gilmore's argument. The RICO statute explicitly defines "racketeering activity" to include "any act which is indictable under . . . section 1028 (relating to fraud and related activity in connection with identification documents) . . . [and] section 1344 (relating to financial institution fraud)," 18 U.S.C. § 1961(1)(B), thereby covering bank

27

fraud and identity theft. Accordingly, we hold that the district court properly instructed the jury. [7]

H.

After the jury verdict, Gilmore moved for a new trial. She argued in the district court that she was not a member of UBN because some of the Nine Trey members who testified during trial did not identify her as a co-conspirator and the evidence failed to connect her to the crimes charged. The district court denied her motion, and Gilmore appeals this decision.

"The decision to grant or deny a motion for a new trial is within the broad discretion of the district court." *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004). "Such motions should be awarded[] sparingly, as a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *United States v. Wilson*, 624 F.3d 640, 660 (4th Cir. 2010) (internal quotation marks omitted).

Gilmore does not present such a "rare circumstance," as abundant evidence supports her conviction. She identified herself as a "Blood member" to the arresting officer, and several witnesses testified extensively to her membership and criminal gang activities. For instance, a Nine Trey member, Quincy Burrell, identified Gilmore as "a Nine Trey

---

[7] Similarly without merit is Gilmore's challenge of the district court's refusal to instruct the jury that it must find the racketeering activity "substantially" affected interstate commerce. J.A. 3476. The court denied this request because that element was inapplicable here. Gilmore argues on appeal the exclusion of the "substantial" modifier from the jury instruction was error, but this argument contradicts our established precedent. We disagree because "a de minimis effect on interstate commerce is all that was required to satisfy RICO's commerce element." *Cornell*, 780 F.3d at 621.

28

member," J.A. 2355, and testified that they engaged in drug trafficking. J.A. 2357–58 (testifying that he and Gilmore engaged in a "test run" of "selling drugs" and that "[he] gave Cynthia seven grams of heroin. . . . She gave [him] $200[.]"). Further, Lewis testified that she committed tax fraud under the direction of "Cynt." J.A. 2636. Based on this evidence, we reject Gilmore's contention.

## I.

Gutierrez and Baxton contend that insufficient evidence supports the jury's civil forfeiture findings. After the jury rendered a verdict finding Baxton and Gutierrez guilty, the Government moved for forfeiture of commissary funds Baxton and Gutierrez received from certain UBN members or derived from racketeering activities. The district court instructed the jury to decide whether to forfeit the $6,767.03 seized from Gutierrez's prison commissary account and the $9,268.15 seized from Baxton's prison commissary account. The jury found that Gutierrez and Baxton derived those proceeds from racketeering activities in violation of § 1962[8] and those proceeds afforded them a source of influence over the racketeering enterprise they controlled.

> As discussed, we will not overturn the jury's verdict unless
>
> the prosecution's failure is clear. That is, the jury's verdict *must be upheld* on appeal if there is substantial evidence in the record to support it. We have defined substantial evidence as evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's

---

[8] Section 1962 states, in relevant part, "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of [RICO] . . . ." 18 U.S.C. § 1962(a).

29

guilt beyond a reasonable doubt. In evaluating an issue of evidence sufficiency, we view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government.

*United States v. Farrell*, 921 F.3d 116, 136 (4th Cir. 2019) (internal quotation marks, citations, and alteration omitted omitted). This standard imposes a heavy burden on Gutierrez and Baxton, which they have not met.

The commissary funds were forfeited pursuant to § 1963(a)(3), which requires forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of [§] 1962." Substantial evidence shows that these funds qualify as proceeds prohibited under § 1963(a)(3) because they were gang dues from UBN members or gains from criminal activities, such as robbery and drug trafficking, in violation of § 1962. Accordingly, we affirm the jury's forfeiture verdict.

## J.

Appellants also contend their respective sentences were procedurally and substantively unreasonable. In reviewing a sentence, this Court first must ensure that the sentences are procedurally sound and, if they are, then must consider whether they are substantively reasonable. *United States v. Provance*, 944 F.3d 213, 218 (4th Cir. 2019). We review the district "court's factual findings for clear error and its legal conclusions de novo." *United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018).

Appellants contend that the district court committed procedural error by improperly calculating their base offense levels. In a RICO case the base offense level is the greater of

30

19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a). If a defendant has committed multiple underlying racketeering activities, the court should then "treat each underlying offense as if contained in a separate count of conviction." *Id.* cmt. n.1.

Here, the jury did not specify the underlying racketeering offenses for Appellants' RICO convictions. Instead, the district court separately determined the applicable offenses as follows: for Gutierrez, conspiracy or solicitation to commit murder resulting in a base offense level of 33; for Baxton, drug trafficking in an amount totaling at least 1,600 kilograms resulting in a base offense level of 30; and for Gilmore, robbery resulting in a base offense level of 20. Appellants argue that these determinations were erroneous because the district court lacked sufficient evidence to find that Appellants committed any of the underlying offenses.

We reject this contention because, as the district court articulated, the Government presented ample evidence during the jury trial and the sentencing hearings that Appellants engaged in the attributed underlying racketeering activities. J.A. 4026–27 (the Government's summary of a UBN member's testimony that he sold drugs to pay dues to Baxton); J.A. 4102 (finding Baxton engaged in "smuggling contraband in the prisons now – drugs"); J.A. 4143 (concluding the Government showed by "a preponderance of the evidence" Gutierrez's order to murder a rival gang member); J.A. 4335–37 (finding by a preponderance of the evidence that Gilmore was involved in the robbery and discussing supporting evidence).

31

Alternatively, Appellants assert that even if such evidence existed in the record, the court erred because it made its findings by a preponderance of the evidence instead of beyond a reasonable doubt. We disagree. In making its findings, the district court was not required to apply the reasonable doubt standard but properly used the preponderance of evidence standard. *See Mouzone*, 687 F.3d at 220. Our precedent has repeatedly reviewed and affirmed rulings in which the district court used that standard to make findings that were challenged on appeal.

For example, we affirmed in *Mouzone* the district court's finding by a preponderance of the evidence that a defendant committed murder and its decision to use the offense of murder in calculating a base offense level. In *Mouzone*, the jury had convicted the defendant of a RICO conspiracy, finding that distribution of narcotics and robbery were the conspiracy objectives. But the jury specifically "declined to find that murder or conspiracy to commit murder was a conspiracy objective." *Id.* at 212. Despite the jury's finding, at sentencing, the district court determined that the defendant "'more likely than not'" committed murder and applied the offense level applicable to murder as the defendant's base offense level. *Id.* at 220. On appeal, the defendant argued that the district court lacked sufficient evidence to make this finding and erred in treating murder as an underlying racketeering activity. We rejected this argument and upheld the district court's determination of the base offense level because the Government presented ample evidence at trial under a preponderance standard that the defendant committed the crime. We further held that, "while we recognize that the jury declined to find that [the defendant]

32

murdered [the victim], we also affirm the district court's entitlement to make its own findings, supported by a preponderance of the evidence, regarding [the defendant's] offenses for sentencing purposes." *Id.*; *see United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008) ("Sentencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict.").

Similarly, in *United States v. Zelaya*, we affirmed the sentence when, in calculating the defendant's base offense level, the district court made findings by a preponderance of the evidence as to a predicate racketeering act independently of the jury verdict. 908 F.3d 920, 930–31 (4th Cir. 2018). There, the defendant was a member of a gang and participated in drug trafficking, robberies, and gang-related gunfights. *Id* at 924. After trial, a jury convicted the defendant of a RICO conspiracy in a general verdict that did not specify predicate racketeering activities. Despite this lack of specific findings for predicate acts, the district court found by a preponderance of the evidence that, as part of the RICO conspiracy, the defendant attempted to commit murder by participating in a gang shooting and used the offense level applicable to the crime of attempted murder in calculating his base offense level. *Id.* at 930–31.

We affirmed on appeal, holding that the defendant's participation in "[t]he shooting was within the scope of [the gang's] criminal activities, in furtherance of them, and reasonably foreseeable in light of them, so it constituted a crime committed as part of the conspiracy." *Id.* at 931 (citing U.S.S.G. § 1B1.2(a)(1)(B)). In affirming the court's

sentencing determinations, we did not question the district court's established authority to make its sentencing findings by a preponderance of the evidence in determining the base offense level. In light of our established case law, the district court here properly made its sentencing findings "by a preponderance of the evidence," and held, "[t]he jury doesn't have anything to do with what I decide today." J.A. 4041.

By arguing that the district court erred in using the preponderance standard during sentence, Appellants ignore our precedent and instead rely on a single out-of-circuit decision, *United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001). In that case, the Eleventh Circuit held that when "the jury verdict was ambiguous as to which acts supported the conspiracy conviction," "[t]he [district] court was . . . required to determine the predicate acts underlying each defendant's conspiracy conviction using the reasonable doubt standard." *Id.* at 1341-42. The court reached this conclusion based on Comment 4 to U.S.S.G. § 1B1.2(d), which notes, when a guilty verdict "does not establish which offense(s) was the object of the conspiracy," a defendant should be sentenced based on an offense that was the object of the conspiracy "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." U.S.S.G. § 1B1.2(d) cmt. 4.; *see Nguyen*, 255 F.3d at 1341–42.

As the Seventh Circuit has noted, however, "every other circuit to consider th[is] question" has rejected the Eleventh Circuit's approach. *United States v. Garcia*, 754 F.3d 460, 482 (7th Cir. 2014) (citing *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008); *United States v. Corrado*, 227 F.3d 528, 541–42 (6th Cir. 2000); *United States v. Carrozza*,

4 F.3d 70, 79–80 (1st Cir. 1993)). The *Garcia* court explained that the object of a RICO conspiracy is "to engage in racketeering," not to commit each predicate racketeering act. *Id.* Furthermore, the court held that making specific findings as to each underlying racketeering offense under U.S.S.G. § 1B1.2(d) would conflict with U.S.S.G. § 2E1.1(a)(2), which specifically governs the RICO sentencing scheme.

As the *Garcia* court elaborated,

RICO conspiracies are of the single-object variety, with the object being to engage in racketeering. The predicate racketeering acts are not, in themselves, conspiratorial objects.

We have understood RICO conspiracies in the same way as the majority of our sister circuits—that is, as arrangements devoted to a single objective. Consistently with that view, we now hold that § 1B1.2(d) does not apply to RICO conspiracies. We note that this position has the virtue of fitting better with the RICO guideline, § 2E1.1(a)(2), which calls for replacing the RICO baseline of 19 with the level applicable to the most serious underlying conduct if that offense level would be higher. That would make little sense if the underlying conduct had to be treated as separate counts.

*Id.* at 482–83 (internal citations omitted).

This holding in *Garcia* is in accord with our cases, including *Mouzone* and *Zelaya*, in which district courts determined by a preponderance of the evidence defendants' most serious racketeering activities and used the offense levels applicable to those activities as the base offense levels under § 2E1.1(a)(2). Lest there be any doubt going forward, we now join the overwhelming majority of our sister circuits in specifically holding that the preponderance standard is the appropriate standard for sentencing determinations in a RICO conspiracy—that is, a sentencing court may make sentencing findings by a

preponderance of the evidence under U.S.S.G. § 2E1.1(a). Accordingly, the district court here used the proper standard to determine the base offense level.

Lastly, Appellants challenge their sentences as generally being procedurally and substantively unreasonable. We first examine whether their sentences are procedurally reasonable and hold that they are. Our review shows that the sentencing court did not commit any procedural error, such as, "failing to properly calculate the applicable Sentencing Guidelines range, failing to consider the 18 U.S.C. § 3553(a) factors, and failing to adequately explain the sentence -- including an explanation for any deviation from the Guidelines range." *Provance*, 944 F.3d at 218 (internal quotation marks omitted).

The district court considered each Appellant's criminal and personal history, criminal conduct, objections to certain sentencing enhancements, and the evidence presented during the trial and the sentencing hearings. After careful consideration, it overruled most objections to the enhancements, articulated its findings as to Appellants' relevant criminal conduct and supporting reasons, and determined a sentence for each Appellant. With respect to Gutierrez, the court calculated his Guidelines range to be from 360 months to life imprisonment but sentenced him to 240 months' imprisonment because that was the RICO statutory maximum sentence. Baxton's Guidelines range was also 360 months to life imprisonment, but he likewise was sentenced to 240 months' imprisonment. As to Gilmore, her sentencing calculation resulted in a Guidelines range of 210 to 240 months' imprisonment, and the court sentenced her to 228 months in prison.

Based on the district court's thorough explanations, we are satisfied that it made "an individualized assessment based on the facts presented and . . . state[d] in open court the particular reasons supporting its chosen sentence." *Provance*, 944 F.3d at 218 (internal quotation marks omitted). It also "address[ed] the parties' nonfrivolous arguments in favor of a particular sentence, and . . . explain[ed] why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review." *Id.* (internal quotation marks omitted). "In doing so, the sentencing judge . . . set forth enough to satisfy [us] that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority." *Id.* (internal quotation marks omitted).

Finding no procedural error, we then review the substantive reasonableness of Appellants' sentences "for abuse of discretion only." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014). We start with a presumption that Appellants' sentences are reasonable because each is below or within a properly calculated Guidelines range. *See id.* "Such a presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *Id.* Appellants do not make this showing because their arguments present nothing more than their disagreements with the district court's factual findings and legal conclusions, which do not show that their sentences are unreasonable when measured against the § 3553(a) factors. Accordingly, we hold the respective sentences are procedurally and substantively reasonable and affirm each sentence.

III.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid in the decisional process. The judgment of the district court is

*AFFIRMED.*