**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4855

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KENNETH D. BEVERLY,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, District Judge.  (3:05-cr-00526-HEH)

Argued: May 14, 2008                    Decided:  July 21, 2008

Before WILLIAMS, Chief Judge, NIEMEYER, Circuit Judge, and Alexander WILLIAMS, Jr., United States District Judge for the District of Maryland, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Andrea E. Gambino, Chicago, Illinois, for Appellant.  Paul Torzilli, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Chuck Rosenberg, United States Attorney, Alexandria, Virginia, Gurney Wingate Grant, II, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kenneth Beverly appeals his conviction for thirty-six counts of health care fraud under 18 U.S.C. § 1347 (2008), and the 151-month sentence imposed by the district court. Specifically, Beverly contends that his conviction should be reversed because there was insufficient evidence to sustain his conviction. In the alternative, Beverly seeks re-sentencing on the ground that the district court erred in its calculation of the appropriate advisory sentencing guidelines, arguing that the court (1) incorrectly applied a four-level enhancement to his offense level pursuant to U.S. Sentencing Guidelines ("U.S.S.G.") § 3B1.1 (2008), (2) erred in increasing his offense level for abuse of trust pursuant to U.S.S.G. § 3B1.3, and (3) erred in its calculation of the loss amount pursuant to U.S.S.G. § 2B1.1(b). In addition, Beverly questions the reasonableness of his sentence on the ground that the district court failed to adequately consider the factors of 18 U.S.C. § 3553(a)(2008). After careful consideration of the record, and finding no error, we affirm Beverly's conviction and sentence.

I.

The evidence at trial, viewed in the light most favorable to the government, see United States v. Allen, 491 F.3d 178, 185 (4th Cir. 2007), revealed the following facts. Kenneth Beverly was the founder, owner, and operator of Rights of Passage Enhanced, Inc.

2

("ROPE"), a program designed to help individuals with mental illnesses develop new skills and function in their living environment. In 2001, ROPE became a licensed provider of Psychosocial Rehabilitative Services ("PSRS") under Medicaid.[1]

The Department of Medical Assistance Services ("DMAS"), Virginia's State Medicaid Agency, oversees healthcare providers who furnish services to recipients qualified to receive Medicaid benefits and is charged with ensuring that Medicaid pays only for services properly rendered to eligible individuals. DMAS periodically audits PSRS providers by conducting unannounced, on-site utilization reviews of the providers' facilities. On October 15-21, 2002, DMAS conducted a utilization review of ROPE, during which DMAS found that ROPE was billing DMAS and receiving payments for dozens of recipients who were not eligible to receive PSRS. Recipients were deemed ineligible due to not having any mental health diagnosis or due to suffering from mental or physical impairments to such a degree that would prevent them from benefitting from PSRS. DMAS employees also observed recipients coloring and watching television, instead of engaging in an activity-based program.

The utilization review concluded with a customary exit interview, conducted by DMAS employee Karen Lawson ("Lawson") on

---

[1]Medicaid, administered by the state governments, is a federal health care program that was established to provide healthcare to low income individuals.

October 21, 2002.  Lawson informed Beverly of the ineligibility problems DMAS had detected, particularly the lack of mental health diagnoses, such as dementia, which would make recipients ineligible for the PSRS program.  Beverly acknowledged that some of the ROPE clients were ineligible for PSRS.  Despite being informed of the ineligibility problems, and also admitting to having knowledge of some of those problems, Beverly continued to bill Medicaid for patients who were ineligible to receive services offered by PSRS. The thirty-six counts of health care fraud, which correspond to Beverly's conviction, resulted from claims paid by DMAS after the exit interview.  Many of those recipients were found to be ineligible for the same reasons discussed during the exit interview; eight of the recipients were the same individuals whose charts were audited during the utilization review.

In addition to the continued submissions of claims to Medicaid for ineligible recipients, Beverly created service agreements between ROPE and his daughter, Keni Vanzant, to whom he issued checks from ROPE's account and subsequently placed those funds into a bank account nominally designated as jointly held by Beverly and Vanzant, but controlled by Beverly.  For the year 2001, checks totaling $110,881.71 were issued to Vanzant from ROPE's account. Vanzant, however, never saw any of these checks, and, in fact, was never a ROPE employee and never performed any of the services described in the consulting agreement.

4

The jury found Beverly guilty of thirty-six counts of health care fraud, in violation of 18 U.S.C. § 1347.  The jury also found Beverly guilty of seven other counts, which are not at issue in this appeal: Subornation of Perjury (Count 37), 18 U.S.C. § 1622; Witness Tampering (Count 38), 18 U.S.C. § 1512; Material False Statement (Counts 39-40), 18 U.S.C. § 1001; Tax Evasion (Count 41), 26 U.S.C. § 7201; Fraud and False Statements (Count 42), 26 U.S.C. § 7206; and Failure to File Tax Return, 26 U.S.C. § 7203 (Count 43).  The district court sentenced Beverly to 151 months in prison. This appeal followed.

II.

Beverly contends that there was insufficient evidence to sustain his conviction.  He argues that the evidence did not establish a scheme to defraud Medicaid or that he made false or fraudulent representations.  In addition, Beverly claims that the evidence did not establish that he possessed the requisite mens rea to commit fraud – intent to defraud.

In evaluating a challenge to the sufficiency of evidence for a conviction, we must determine whether, "construing the evidence in the light most favorable to the government, any reasonable jury could find the defendant guilty beyond a reasonable doubt." Allen, 491 F.3d at 185.  The government is given "the benefit of all reasonable inferences from the facts proven to those sought to be

established."  Id.  We must uphold the jury's verdict "[i]f the record reflects that the Government presented substantial evidence from which a reasonable jury could convict."  United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001).

The health care fraud statute provides, in pertinent part:

> Whoever knowingly and wilfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2)to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program . . . ."

18 U.S.C. § 1347.  When determining what is meant by a "scheme or artifice to defraud," we must look to the "common-law understanding of fraud," which includes "acts taken to conceal, create a false impression, mislead, or otherwise deceive."  United States v. Colton, 231 F.3d 890, 898 (4th Cir. 2000).  Also important to the analysis of common law fraud is whether the defendant "fraudulently produc[ed] a false impression upon the mind of the other party; and if the result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff."  Id. at 899.

The evidence adduced at trial, when viewed in the light most favorable to the Government, supports the jury's verdict that Beverly engaged in conduct satisfying the elements of the health care fraud statute.

Beverly first argues that he did not engage in a "scheme to defraud" Medicaid because he did not make any affirmative misrepresentations or fraudulent concealments to DMAS. The evidence presented at trial establishes otherwise. The testimony of Karen Lawson, DMAS employee and court-certified expert in Medicaid, demonstrated that ROPE billed Medicaid for patients who were ineligible to receive PSRS services and failed to provide PSRS to individuals documented to receive such services. Lawson testified that proper documentation did not exist for many of the patients, and in those instances where proper documentation did exist, Lawson discovered that many of those patients did not meet the criteria for PSRS. During the exit interview, Lawson informed Beverly of these ineligibility problems, specifically noting that several patients were physically and/or mentally impaired to such a degree that would render them ineligible for PSRS (*i.e.*, those resulting from dementia, mental retardation, and physical disabilities). Beverly even acknowledged that some of the patients were ineligible for the PSRS program. Even more telling of Beverly's "scheme" is the fact that, following the exit-interview, ROPE continued to bill Medicaid for PSRS on behalf of individuals for whom no documented mental health evaluation was performed and for individuals suffering from the same physical and mental infirmities Lawson expressly discussed with Beverly.

In addition, Lawson opined that each of the thirty-six ROPE patients, who correspond to the thirty-six counts of health care fraud, were not eligible for PSRS. The reasons provided for the patients' ineligibility correspond to ineligibility problems Lawson discussed with Beverly during the exit interview. Based upon these facts, it was not unreasonable for the jury to conclude that Beverly engaged in a scheme to defraud Medicaid. Contrary to Beverly's contention that he did not make any misrepresentations or fraudulent concealments to DMAS, the jury could reasonably infer that his misrepresentations were contained in the claims submitted to DMAS, in which ROPE continued to seek payment for persons ineligible to receive PSRS, even after being informed of the ineligibility problems. We, therefore, find that sufficient evidence was presented at trial from which a jury could reasonably infer that Beverly perpetuated a scheme to defraud Medicaid.

B.

Beverly next contends that the evidence did not establish that he acted with a specific intent to defraud Medicaid. Intent to defraud, "may be inferred from the totality of the circumstances and need not be proven by direct evidence." Godwin, 272 F.3d at 666. In particular, intent "can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." United States v. Davis, 490 F.3d 541, 549 (6th Cir. 2007) (affirming health care fraud convictions).

8

Beverly argues that the evidence did not establish that he knowingly submitted or caused to be submitted any false information to DMAS. This argument is devoid of merit given the evidence that he continued to bill and receive payments from Medicaid even after being informed, thus constituting knowledge, of the ineligibility problems. In addition, Beverly orchestrated a consulting agreement with Vanzant, through which he wrote checks totaling $110,881.71 in 2001. Essentially, Beverly was purportedly making payments to Vanzant, who was unaware of such payments, for services never performed by her, and channeled those funds into his personal bank account. Even more troubling is that Beverly told Vanzant to lie about her non-existent payments from ROPE.

In light of such evidence, the jury could reasonably infer Beverly's intent to defraud Medicaid. While Beverly posits that the billing and record keeping could be characterized as careless or negligent, we find that the mound of evidence before the jury can be more appropriately characterized as intent to defraud.

In sum, the evidence presented at trial was sufficient to show that Beverly concocted a scheme to defraud and possessed the requisite intent to defraud Medicaid. We must, therefore, affirm his conviction.

III.

Having resolved the issues related to Beverly's conviction, we now turn to his sentence. Beverly raises multiple challenges with respect to his sentence, specifically that the district court erred by: (1) applying a four-level enhancement to his offense level pursuant to U.S.S.G. § 3B1.1; (2) increasing his offense level for abuse of trust pursuant to U.S.S.G. § 3B1.3; (3) calculating the loss amount pursuant to U.S.S.G. § 2B1.1(b); and (4) failing to consider the 3553(a) factors.

"In assessing a challenge to a sentencing court's application of the Guidelines, [this Court] review[s] the [district] court's factual findings for clear error and its legal conclusions de novo." United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006).


A.

Beverly first contends that the district court erred in imposing a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), for his participation as an "organizer or leader" of an "otherwise extensive" criminal activity. He argues that the evidence did not establish that he organized or led one or more other participants. We review the decision to apply a sentencing adjustment based on the defendant's role in the offense for clear error. United States v. Sayles, 296 F.3d 219, 224 (4th Cir. 2002).

10

Beverly's Pre-Sentence Report proposed a four-level enhancement for his role in the offense as "an organization or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The government, although conceding that Beverly's criminal activity did not involve five or more "participants," asserted the four-level enhancement was nevertheless appropriate because Beverly's criminal activity was "otherwise extensive." The district court agreed.

To qualify for an adjustment under § 3B1.1(a), the defendant must, at a minimum, have been the "organizer or leader" of "one or more other participants." U.S.S.G. § 3B1.1, cmt. (n.2). In assessing whether an activity is "otherwise extensive," we have held that courts may consider "all persons involved during the course of the entire offense, even the unknowing services of many outsiders." United States v. Ellis, 951 F.2d 580, 585 (4th Cir. 1991) (quoting U.S.S.G. § 3B1.1, cmt. (n.3)). The district court must also consider "all relevant conduct as defined by U.S.S.G. § 1B1.3."[2] United States v. Perrin, 237 Fed. Appx. 899, 900 (4th

---

[2]U.S.S.G. § 1B1.3 provides factors that determine the guideline range, including:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant . . .
> (3) all harm that resulted from the acts and omissions specified in (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
> (4) any other information specified in the applicable guideline.

Cir. 2007); see also United States v. Fells, 920 F.2d 1179, 1183-84 (4th Cir. 1990)(holding that a district court should consider all relevant conduct).

In determining whether criminal activity is "otherwise extensive," many reviewing courts have examined the "totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991); see also, United States v. Frost, 281 F.3d 654, 658 (7th Cir. 2002) (finding that criminal activity was "otherwise extensive" where a substantial portion of the defendants' income was obtained by fraud, and where the amount of loss was approximately $1.8 million); United States v. D'Andrea, 107 F.3d 949, 959 (1st Cir. 1997) (criminal activity was "otherwise extensive" where activity involved fraud against financial institutions to obtain loans for $8.1 million by submitting false financial information and defendant used witting or unwitting services of others to obtain loans); United States v. Sidhu, 130 F.3d 644, 655 (5th Cir. 1997) (criminal activity was "otherwise extensive" where physician submitted false claims for medical services, recruited numerous office employees to provide billing and collection support for his fraudulent practices, and where fraud could not have succeeded without unwitting participation of his vulnerable patients and unknowing assistance of employees); United States v. Massey, 48

12

F.3d 1560, 1572 (10th Cir. 1995) (fraudulent loan scheme was "otherwise extensive" considering long duration and national scope of the scheme, and the scheme operation had multiple locations and involved many employees other than co-conspirators).

The record demonstrates that the district court considered the individuals as well as the circumstances involved in this offense:

> [Beverly] was the alter ego of a scheme to defraud the Medicaid system that involved numerous employees. It involved many, many clients, many of whom – most of whom were not eligible to receive services. Extensive revenue was derived from this [a loss of over $2.6 million]. He had multiple locations. It was an operation much, much larger than the average type of fraud scheme that this court sees in connection with an operation of this type.

J.A. 553.

In addition, the evidence adduced at trial demonstrates that at least one of Beverly's employees, Vernita Webber (ROPE's bookkeeper), can be considered a "participant" under the Guidelines. "Participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. (n.1). Webber played an important financial role in ROPE's operations. Despite having knowledge that Vanzant never worked for or performed services for ROPE, Webber, nevertheless, prepared and signed the checks that falsely compensated Vanzant for so-called consulting services provided to ROPE. Webber even admitted that she was concerned that she would be charged with a crime. In addition to

13

Webber, Beverly used several other employees and individuals to carry out his scheme: Aljanon Wills, ROPE's day-to-day supervisor; Marion Bennett, the outside contractor who performed billing services for ROPE; and Vanzant, whom Beverly unwittingly used to facilitate the transfer of ROPE funds to his personal bank account.

Based on this evidence, we find that the district court did not err in finding that Beverly participated in criminal activity that was "otherwise extensive."

B.

Beverly next contends that the district court incorrectly applied a two-level enhancement for abuse of trust under U.S.S.G. § 3B1.3. His argument is that the relationship between ROPE and DMAS was commercial and not fiduciary; therefore, he is not subject to the enhancement.

Whether a defendant occupied a position of trust is a "factual determination reviewable for clear error." United States v. Bollin, 264 F.3d 391, 415 (4th Cir. 2001). We have also observed that the determination of "whether a defendant held a position of trust must be examined from the perspective of the victim." United States v. Godwin, 272 F.3d 659, 671 (4th Cir. 2001).

Pursuant to U.S.S.G. § 3B1.3, a two-level adjustment in the base offense level is authorized "[i]f the defendant abused a position of public or private trust . . . in a manner that

14

significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The government notes that the victim of Beverly's health care fraud is Medicaid, and ultimately, the American taxpayers. See United States v. Adam, 70 F.3d 776, 781-82 (4th Cir. 1995) (concluding that victims of Medicaid fraud were "the American taxpayers"). Contrary to Beverly's claim that his relationship to DMAS was purely commercial, we have upheld application of the abuse of trust enhancement in situations where physicians or medical providers have defrauded Medicaid. See id.; see also United States v. Bolden, 325 F.3d 471, 504-05 (4th Cir. 2003) (applying the two-level enhancement for abuse of trust to nursing home operator who perpetuated scheme to defraud Medicaid).[3]

In Bolden, we pointed out that "[b]ecause of the discretion Medicaid confers upon care providers . . . such providers owe a fiduciary duty to Medicaid. Indeed, we see it as paramount that Medicaid be able to 'trust' its service providers." Id. at 505 n.41.

ROPE – founded, owned, and directed by Beverly – billed and received payments from Medicaid for patients who were knowingly deemed ineligible to receive PSRS services. Thus, he abused the

---

[3]Reimbursed medical providers have also been held subject to the abuse of trust enhancement by other circuits. See United States v. Hoogenboom, 209 F.3d 665, 666, 671 (7th Cir. 2000) (enhancement properly applied to psychologist who falsely billed Medicare); United States v. Gieger, 190 F.3d 661, 663, 665 (5th Cir. 1999) (enhancement properly applied to ambulance transportation service provider who submitted fraudulent claims to Medicare).

public funds that were entrusted to ROPE for the benefit of providing individuals with mental illnesses with PSRS services. When viewed from the standpoint of the victims involved here, Medicaid and the American taxpayers, we conclude that Beverly, through his position at ROPE, abused the trust placed in him with respect to proper billing and handling of Medicaid funds. Therefore, just as we held in Bolden, we must rely on the entrustment as evidence of the underlying trust relationship, see Bolden, 325 F.3d at 504, and find that the district court committed no error in applying the two-level enhancement.

## C.

Beverly also challenges the district court's calculation of the amount of loss under U.S.S.G. § 2B1.1(b). He claims that the district court erred in finding that he was responsible for over $2.6 million in loss, when the loss amount charged and proved at trial was only $161,000. In addition, he argues that the testimony presented at the sentencing hearing was not reliable and did not provide a sufficient basis for assessing an accurate loss figure.

We review the district court's calculation of the amount of loss under the clear error standard. United States v. Battle, 499 F.3d 315, 323 (4th Cir. 2007). To the extent that there was any perceived inconsistency or unreliability, we have held that "[a]s the sentencing judge, a district court judge is in the best

16

position to assess credibility, observe the demeanor of witnesses, resolve conflicting evidence, and determine the weight of the evidence." United States v. Dyess, 478 F.3d 224, 245 (4th Cir. 2007). Morever, the sentencing guidelines provide, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, cmt. n.3(C).

To support a loss amount of $2,603,573.39, the government relied on sentencing testimony of Doug Johnson, lead Medicaid investigator in this action, and Karen Lawson, DMAS employee and court-certified expert in Medicaid. Johnson testified that in addition to the amount for claims ROPE received on the thirty-six individuals constituting the counts of conviction ($161,856.40), he also calculated $966,855.01, which represented other claims for patients whose ineligibility was apparent. The loss amount also included funds from which ROPE billed DMAS for patients who were eligible to receive PSRS but never provided PSRS services to those patients. Johnson's testimony was corroborated by Karen Lawson's sentencing testimony, who also noted that ROPE not only billed and received payments for individuals who were ineligible for the program, but that ROPE also billed DMAS, but never provided PSRS services, for patients who were eligible to receive such services.

17

Given this evidence, we find no error in the district court's factual determination of the loss amount.


IV.

Lastly, Beverly contends that the district court did not adequately consider the factors provided in 18 U.S.C. § 3553(a) and imposed an excessive sentence.

Beverly argues that the district court erred by merely mentioning, but not discussing, the § 3553(a) factors before imposing sentence. We review the court's sentencing decision for "reasonableness." United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007). While the district court must consider the various § 3553(a) factors and explain its sentence, it need not explicitly reference § 3553 or discuss every factor on the record, particularly when the court imposes a sentence within the guideline range. United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006). We have held that "[a] sentence within the proper Sentencing Guidelines range is presumptively reasonable." Allen, 491 F.3d at 193.

We must first note that Beverly's 151-month sentence is within the Guideline range. His 120-month sentence on Counts 1-36 corresponds to the statutory maximum for health care fraud, and the Guideline range for his total offense level of 32, is 121-151 months. Therefore, falling within the Guideline range, Beverly's sentence is presumptively reasonable. Allen, 491 F.3d at 193.

18

Although the district court did not discuss each and every element of § 3553(a), the court heard argument regarding the § 3553(a) factors, adequately calculated the range for sentence, explained its decision to sentence Beverly at the high end of the guideline range, and indicated that it considered the § 3553(a) factors. We find that the district court adequately considered the § 3553(a) factors in stating its reasons for Beverly's sentence. Accordingly, we conclude that the sentence imposed by the district court was reasonable.[4]

For the foregoing reasons, we affirm Beverly's conviction and sentence.

AFFIRMED

---

[4]Lastly, Beverly contends that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment's proportionality principle "forbids only extreme sentences that are grossly disproportionate to the crime." Ewing v. California, 538 U.S. 11, 24 (2003). Having found Beverly's sentence to be reasonable, we cannot find that such sentence constitutes cruel and unusual punishment.

19