**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4077**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

JACQUELINE DIANNE OKOMBA,

Defendant – Appellant.

**No. 20-4079**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

LAURENCE SESSUM,

Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:18-cr-00292-RJC-DSC-1; 3:18-cr-00292-RJC-DSC-2)

Submitted: December 10, 2021                    Decided: April 28, 2022

Before AGEE and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Agee and Senior Judge Floyd joined.

————————

**ON BRIEF:** Chiege Ojugo Kalu Okwara, Charlotte, North Carolina, for Appellant Jacqueline Dianne Okomba. Patrick Michael Megaro, HALSCOTT MEGARO, PA, Orlando, Florida, for Appellant Laurence Sessum. R. Andrew Murray, United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Following a joint trial, a jury convicted Laurence Sessum and Jacqueline Dianne Okomba of conspiracy to commit wire fraud and obstruction of justice. The jury also convicted Sessum of wire fraud and conspiracy to commit money laundering. The district court sentenced Sessum to 135 months in prison. Okomba received a 72-month prison sentence. They appeal, raising a host of challenges. We affirm.

I.

A.

The evidence at trial established these facts. In October 2013, Sessum and Okomba opened Direct Processing, LLC, a company that collected "out-of-statute" debts—i.e., unenforceable debts whose statutes of limitations had run.

Direct Processing bought lists of people with such debts, often engaging outside vendors to obtain debtors' contact information. The company then called the debtors using dialer services and left automated messages prompting them to resolve their debts. The messages identified a fictitious caller and warned debtors of impending legal action.

If a debtor responded to the message, they were connected to a Direct Processing employee. These employees used scripted pressure tactics that built on the automated messages, coercing debtors into paying some, all, or more than their alleged debt. And employees earned bonuses the more they collected.

Employees were also trained to inflate the purported debts and tell debtors that Direct Processing would be serving them with legal process, including judgments, wage

garnishments, or liens. And they warned debtors of imminent arrest if the debts went unpaid.

But Direct Processing lacked legal authority to enforce the out-of-statute debts. So it never did. Still, the company collected over $6,000,000 in its first three years of operation.

Sessum and Okomba, as co-owners of Direct Processing, played key roles in its day-to-day business. Sessum bought the lists of debts. He also sent Direct Processing's automated-message scripts to the dialer services. And when debtors agreed to pay, employees emailed payment information to Sessum for processing. At times, Sessum reprimanded employees who threatened debtors with arrest. But these employees rarely faced discipline. If they were fired, the company often rehired them.

Okomba worked as an "office manager" who oversaw Direct Processing's employees. J.A. 509. She ensured that the employees were present, on time, and doing their job. Okomba worked closely with another supervisor, Shane Hough. They directed employees to use false company names in the collection calls—names that Sessum and Hough created when faced with debtor complaints.

As part of Direct Processing's operation, it formed several affiliated companies. Direct Processing and its alter egos maintained at least fifteen bank accounts, with collections deposited into six of those accounts. Sessum and Okomba controlled the primary bank accounts, including Direct Processing's own accounts that received over $4.5 million in collections. And the pair regularly directed funds from Direct Processing to the

4

alter-ego companies.  In turn, the companies used those funds for payroll, dialer services, and debt-list purchases.

B.

In August 2015, the FBI executed a search warrant at Direct Processing's office on Sardis Road in Charlotte, North Carolina.  The day before, the FBI had frozen Direct Processing's brokerage account.  Having noticed the account was frozen, Sessum instructed employee Cameron Leach to "clear out the computers" at the office because "a raid [was] coming." J.A. 774.  Sessum and Okomba were already at the office when Leach arrived.  Leach then loaded his car with phones and computers.  He stored them at his house "until everything . . . cooled down." J.A. 778.

When FBI agents arrived at the office, they discovered most cubicles were missing computers.  Agents did, however, find several scripts describing Direct Processing's debt-collection tactics, as well as paperwork bearing false company names.  Agents spoke with Okomba and Sessum while there.  When asked if she had been tipped off, Okomba noted that the brokerage account had been frozen.  But when pressed about the missing computers, Okomba denied owning any.  For his part, Sessum also mentioned the frozen brokerage account, but he refused to talk about the computers.

Direct Processing later opened a new office.  Though associated with a different company, the FBI traced this office to Direct Processing and obtained a second search warrant.  Agents again recovered scripts describing legal consequences for debtors if they failed to pay and letters to debtors on other companies' letterhead.  Okomba wasn't present during this second search.

5

II.

A.

A grand jury indicted Sessum and Okomba for conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1349 (Count 1); wire fraud, in violation of 18 U.S.C. § 1343 (Count 2); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 3); and obstruction of justice by destruction and concealment of objects and records, in violation of 18 U.S.C. § 1519 (Count 4).[1]

Okomba moved to sever her trial from Sessum's, arguing a joint trial could prejudice her ability to present exculpatory testimony because it would inculpate Sessum. She also argued that evidence going to Sessum's guilt could have a "spillover effect" against her. J.A. 55. The court denied Okomba's motion because any prejudice could be remedied by less drastic measures such as limiting instructions.

On the eve of trial, Sessum and Okomba separately moved to dismiss Counts 1 through 3 of the indictment. They each argued that those charges turned on alleged conduct that violated only the Fair Debt Collection Practices Act or the Federal Trade Commission Act. According to Sessum and Okomba, their conduct amounted to a civil violation, so it couldn't support a criminal prosecution. The district court denied both motions. It found that the "existence of civil remedies" for Sessum and Okomba's alleged conduct didn't bar a prosecution for fraud. J.A. 378.

---

[1] Counts 2 and 4 also charged aiding-and-abetting liability. *See* 18 U.S.C. § 2.

B.

The case proceeded to a jury trial. The government called victims of Direct Processing's collection scheme and former employees. FBI agents testified about the investigation and provided a forensic analysis of bank accounts affiliated with the company. The government also submitted documentary evidence, including emails about purchasing out-of-statute debts, and Direct Processing's debt-collection scripts.

At the close of the government's case, Sessum and Okomba each moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court denied both motions. Neither defendant presented evidence.

During deliberations, the jury asked two questions: (1) "Are debit/credit transactions processed by payment company intermediaries considered wire transactions?"; and (2) "Are email communications considered wire communications?" J.A. 1025. The court found that the first question was factual and for the jury to answer. But over defendants' objections, the court answered the second question in the affirmative.

The jury then found Okomba guilty of conspiracy to commit wire fraud and obstruction of justice but acquitted her on substantive wire fraud and conspiracy to commit money laundering. It convicted Sessum on all four counts.

Following the verdict, Sessum and Okomba renewed their Rule 29 motions and moved for new trials. Okomba challenged the district court's answer to the jury's question about email communications on her wire-fraud-conspiracy conviction, as well as the sufficiency of the evidence supporting her obstruction conviction. She also claimed the latter had been tainted by spillover evidence from Sessum's wrongdoing. Sessum likewise

7

contested the district court's response to the jury's second question and challenged the sufficiency of the evidence underlying his convictions, arguing he only violated civil statutes.

The district court denied both motions.[2]

C.

1.

Sessum's presentence investigation report calculated a Guidelines sentence of 210 to 262 months' imprisonment, based on a total offense level of 36 and a criminal-history category of II. Sessum's money-laundering-conspiracy conviction drove his Guidelines calculation. The report increased this offense's level by 18 based on a loss amount of at least $3.5 million, among other enhancements.

Sessum objected to the report's calculation. He argued that the evidence supported a loss amount of no more than $60,000, particularly since he tried to have "Direct Processing comply with fair debt collection practices." J.A. 1824. Sessum filed a sentencing memorandum to the same effect.

The district court overruled Sessum's objections. It noted that the 18-level increase to his money-laundering-conspiracy conviction required only a loss amount of $3.5 million, far lower than the $6.1 million figure supported by the evidence.

---

[2] The district court denied Okomba's belated motion to adopt Sessum's motion as her own, though it noted this ruling wouldn't have made a difference on the merits.

8

Sessum then argued for a downward variance based on sentencing disparities between himself and other coconspirators, including Hough, who pleaded guilty. Sessum claimed that he faced a longer sentence just because he chose to try his case.

The government responded that only a two-level downward variance was warranted based on disparities. It contrasted Sessum's failure to cooperate and his lack of remorse with his coconspirators' immediate and genuine acceptance of responsibility. But the government supported a second two-level downward variance based on the overlapping nature and circumstances of Sessum's offenses.

The district court sentenced Sessum to 135 months' imprisonment, in line with the government's proposed variances. It found Sessum's conduct "heinous" and "consistent with [his] other illegal activity" beginning in 2011.[3] J.A. 1331. Such conduct reflected the "compelling need" for a sentence that would deter his activity and reflect the seriousness of his crimes. *Id.* Though the court considered Sessum's arguments on sentencing disparities, it found such disparities justified. Unlike Sessum, his coconspirators accepted responsibility and, importantly, hadn't obstructed the FBI's investigation. Ultimately, the court determined that the sentence was sufficient but not greater than necessary to accomplish 18 U.S.C. § 3553(a)'s sentencing objectives.

---

[3] Sessum had prior convictions for larceny, fraud, and the operation of an unlicensed collection agency.

## 2.

Okomba's presentence investigation report calculated a Guidelines sentence of 121 to 151 months' imprisonment, based on a total offense level of 32 and a criminal-history category of I. Okomba's wire-fraud-conspiracy conviction drove her Guidelines calculation. Like for Sessum, this conviction carried an 18-level increase based on a loss amount of at least $3.5 million. The report also enhanced Okomba's offense because (1) it involved more than ten victims, (2) she was a manager or supervisor in the conspiracy, and (3) she obstructed justice.

Okomba challenged the loss amount and claimed there was insufficient evidence to support her supervisory role in the scheme. She argued for a three-level decrease because she was only a minor participant in the conspiracy. Okomba's sentencing memorandum also emphasized her lack of criminal history and sophistication. And she asserted that she hadn't been involved with Direct Processing following the FBI's first search.

The district court overruled Okomba's objections. As it had for Sessum, the court found that the evidence supported the 18-level increase based on the loss amount. And it was persuaded that Okomba had an aggravating (and not minor) role in the "extensive" conspiracy given her status as a co-owner of Direct Processing with authority over several employees. J.A. 1357–58.

Okomba then requested a downward variance to three years' probation, advancing many of the same arguments she made in objecting to the presentence report. She also highlighted her strong community ties, low risk of recidivism, and that she was just a pawn in Sessum's scheme.

The government agreed to a two-level downward variance, as it had for Okomba's coconspirators. The government also supported two separate one-level reductions: one because Okomba wasn't involved in "branching out" Direct Processing after the FBI's Sardis Road search; the other because she was less culpable than Sessum. J.A. 1371–72. The government explained that Okomba wasn't implicated in the creation of alter-ego entities and bank accounts following the FBI's first search. It recommended a 72-month sentence.

The district court imposed the government's proposed sentence. It considered Okomba's arguments for a probationary sentence, as well as her allocution and family engagement. But the court rejected those claims because of the seriousness of Okomba's offense, her role in the scheme, and her "added deception" when confronted by law enforcement. J.A. 1373–74.

\*        \*        \*

Sessum and Okomba timely appealed their convictions and sentences.

III.

Sessum and Okomba raise four challenges to their convictions, though Okomba brings the final one alone. We discuss each in turn.

A.

Sessum and Okomba first argue that the district court erred by denying their motions to dismiss the indictment for lack of jurisdiction. They claim that the unlawful conduct alleged in the indictment falls exclusively under the prohibitions of the Fair Debt Collection

Practices Act or the Federal Trade Commission Act. And because neither statute provides for criminal liability, Sessum and Okomba contend the indictment fails to state a claim, depriving the district court of jurisdiction. We disagree.

We review a district court's legal conclusions on a motion to dismiss an indictment de novo. *United States v. Hosford*, 843 F.3d 161, 163 (4th Cir. 2016).

As the district court rightly found, the existence of civil remedies for Sessum and Okomba's conduct doesn't bar a criminal prosecution for fraud. Courts routinely affirm criminal convictions involving conduct that could subject a defendant to civil liability. *See, e.g.*, *United States v. Chikvashvili*, 859 F.3d 285, 288–90 (4th Cir. 2017) (affirming convictions for healthcare fraud); *United States v. Williams*, 736 F. App'x 267, 270–71 (2d Cir. 2018) (rejecting that a parallel civil action by the Federal Trade Commission precluded criminal prosecution for fraudulent debt collection under the Double Jeopardy Clause).

Sessum and Okomba don't otherwise dispute the adequacy of the indictment. So we affirm the district court's denial of their motions to dismiss.

## B.

Sessum and Okomba next challenge the sufficiency of the evidence supporting their convictions. On the wire-fraud convictions, Sessum and Okomba say that they had the right to collect the lawfully purchased debts and that there's no evidence they personally threatened debtors. For conspiracy to commit money laundering, Sessum argues that Direct Processing's activities were lawful, and that the government failed to show his use of criminally derived proceeds. Last, Sessum and Okomba contend their obstruction

12

convictions fail because there was no evidence that they hindered a matter they knew to be within the government's criminal jurisdiction.

We review de novo the denial of a motion for judgment of acquittal. *United States v. Zelaya*, 908 F.3d 920, 925 (4th Cir. 2018). We uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, "the verdict is supported by substantial evidence." *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018). "Substantial evidence is that which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (cleaned up). We're "not entitled to assess witness credibility" and must "assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (cleaned up).

Because substantial evidence supports the convictions, we affirm the district court's denial of the Rule 29 motions.

1.

We turn first to the conspiracy and substantive convictions for wire fraud. To prove Sessum and Okomba conspired to commit wire fraud, the government had to show (1) they agreed to commit wire fraud; and (2) they "willfully joined the conspiracy with the intent to further its unlawful purpose." *Burfoot*, 899 F.3d at 335. A jury "need not rely on direct evidence but may infer conspiracy from the facts and circumstances of the case." *United States v. Dennis*, 19 F.4th 656, 669 (4th Cir. 2021). And a substantive wire-fraud conviction requires that a defendant "(1) devised or intended to devise a scheme to defraud

13

and (2) used or caused the use of wire communications in furtherance of that scheme." *Burfoot*, 899 F.3d at 335.

Sessum and Okomba claim they "had a right to collect on the debt they had lawfully purchased," Appellants' Br. at 15, so the government couldn't show their intent to defraud.[4] But their legal right to collect the debt is beside the point. What matters is their intent to use fraudulent means to collect the debt. Ample evidence supports the jury's verdict in that regard.

Direct Processing employees described several fraudulent tactics used to collect on expired debts. Some told the jury how they regularly collected amounts greater than what debtors owed, motivated in part by the company's bonus structure. Others discussed Sessum's emails, which contained scripted messages that threatened debtors with non-existent legal consequences if they didn't pay. Okomba directly managed the employees who used these tactics. The jury also heard how Sessum and Okomba created false company names and instructed employees to use them when calling debtors. Such evidence reveals their intent to participate in (and further) the scheme to defraud. *See United States v. Perry*, 757 F.3d 166, 176 (4th Cir. 2014) (stating that "scheme to defraud" includes "acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information" (cleaned up)).

---

[4] Sessum relies on this argument for both his conspiracy and substantive convictions for wire fraud. We thus address his wire-fraud convictions together.

14

Sessum and Okomba say that they never personally threatened debtors and that Sessum fired employees who went too far. Neither contention persuades us. That these defendants never communicated directly with debtors doesn't negate the other actions they took to facilitate the criminal scheme. Nor do Sessum's sporadic efforts to discipline allegedly rogue employees absolve him. The jury heard testimony that Direct Processing routinely rehired employees it had fired.

We hold that sufficient evidence supports Sessum and Okomba's wire-fraud-conspiracy convictions, as well as Sessum's substantive wire-fraud conviction.

2.

Sessum contests his conviction for conspiracy to commit money laundering. He claims Direct Processing's activities were lawful, so any income it generated wasn't "criminally-derived." Appellants' Br. at 16. This argument is unavailing.

To prove a money-laundering-conspiracy charge, the government had to show (1) an agreement to commit a substantive money-laundering offense; (2) that Sessum "knew that the money laundering proceeds had been derived from an illegal activity"; and (3) that Sessum "knowingly and voluntarily became part of the conspiracy." *United States v. Farrell*, 921 F.3d 116, 136–37 (4th Cir. 2019).

Although Sessum denies it, Direct Processing's activities *were* illegal. Under Sessum's oversight, Direct Processing employees engaged in fraudulent practices to collect otherwise unenforceable debts (often in amounts exceeding the face value of the debts) on the threat of illusory legal consequences. We therefore reject Sessum's claim of error.

3.

Sessum and Okomba also challenge their obstruction convictions. To prove this offense, the government had to show (1) Sessum and Okomba concealed a record, document, or tangible object; (2) they did so knowingly; and (3) they "intended to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of any department or agency of the United States." *See United States v. Hassler*, 992 F.3d 243, 246–47 (4th Cir. 2021) (cleaned up); 18 U.S.C. § 1519.

Sessum and Okomba first argue that their convictions fail because they didn't obstruct a matter within the FBI's *criminal* jurisdiction. But we've already rejected the notion that civil liability for Sessum and Okomba's unlawful conduct somehow precludes criminal prosecution.

Next, Sessum and Okomba argue that the government failed to prove they knew the search of the Sardis Road office constituted "an actual or contemplated [FBI] investigation." Appellants' Br. at 17. The government, however, wasn't required to prove this. *Hassler*, 992 F.3d at 247 ("The Government [is] not required to prove that [the defendant] knew or contemplated that the investigation he intended to impede was within the jurisdiction of a federal agency."). On § 1519's jurisdictional element, the jury heard substantial evidence to infer that the FBI was actively investigating Sessum and Okomba during the Sardis Road search.[5]

---

[5] If Sessum and Okomba mean to challenge the sufficiency of the evidence going to their knowledge and intent, we're not convinced. They learned that Direct Processing's brokerage account had been frozen before the FBI's search and immediately moved to hide

In the light most favorable to the government, the evidence shows Sessum and Okomba helped hide Direct Processing's computers from the FBI.[6]  Sessum ordered it. Okomba lied about it.  Sufficient evidence then supports their convictions for obstruction of justice.

C.

Sessum and Okomba next assert that the district court erred in answering the jury's question about whether emails are wire communications under 18 U.S.C. § 1343.  First, they claim the district court improperly relieved the government of proving an essential element of the wire-fraud counts.  Second, they argue that the district court's response was an "eleventh hour change in the instructions" that constructively amended their indictment. Appellants' Br. at 29.  We disagree on both points.

1.

"We review a district court's decision to respond to a jury's question, and the form of that response, for an abuse of discretion."  *United States v. Foster*, 507 F.3d 233, 244 (4th Cir. 2007).  A district court has a general obligation to "give instructions to the jury that fairly state the controlling law."  *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016) (cleaned up).  When the jury asks a clarifying question, the court should

---

company computers because a "raid [was] coming."  J.A. 774; *see Yates v. United States*, 574 U.S. 528, 547 (2015) (Section 1519 "covers conduct intended to impede any federal investigation or proceeding, including one not even on the verge of commencement.").

[6] Sessum and Okomba say they weren't "present when [Leach] removed the computers" the night before the FBI's search of the Sardis Road office.  Appellants' Br. at 17.  But the jury could credit Leach's testimony to the contrary.

17

"respond to the jury's apparent source of confusion fairly and accurately without creating prejudice." *Id.* (cleaned up). We'll reverse only if the court's response is "prejudicial in the context of the record as a whole." *Foster*, 507 F.3d at 244.

Sessum and Okomba's first contention—that the district court's response resolved elements of the wire-fraud offenses—turns on the jury's question being one of fact, rather than law. But the district court rightly determined that whether emails are wire communications under § 1343 is a legal question. And we find that the district court's affirmative response to the question was a fair statement of the law.

It's true that § 1343 doesn't define "wire communications." But we've affirmed instructions informing the jury that "electronic communications" (like emails) are within § 1343's scope.[7] *See, e.g.*, *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012). And we've upheld wire-fraud convictions based on the use of emails. *See, e.g.*, *United States v. Delavan*, 826 F. App'x 259, 263 (4th Cir. 2020) (affirming § 1343 conviction when the defendant "used or caused the use of wire communications (email) in furtherance of [a fraudulent] scheme").

Sessum and Okomba's argument to the contrary rests on the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, which they say excludes emails from its definition of wire communications. *See id.* §§ 2510(1), (18). But such definitions apply only within that Act. *See id.* § 2510

---

[7] Our sister circuits agree. *See United States v. Valdes-Ayala*, 900 F.3d 20, 33 n.15 (1st Cir. 2018) ("An email address has long counted as a wire communication."); *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (stating that § 1343 prohibits schemes to defraud by fraudulent means "if interstate wire or electronic communications are used").

(setting forth definitions "[a]s used in this chapter"). We thus decline to apply § 2510's definitions to offenses under § 1343.

It's not disputed that Sessum and Okomba used emails to further their scheme, so the court didn't err in clarifying that emails fell within the scope of § 1343.

2.

Sessum and Okomba also contend that the district court's response to the jury's question constructively amended their indictment by expanding the possible grounds of conviction for the wire-fraud offenses.

"The Fifth Amendment guarantees that a criminal defendant will be tried only on charges in a grand jury indictment, so only the grand jury may broaden or alter the charges." *Burfoot*, 899 F.3d at 338 (cleaned up). Thus, a district court constructively amends the indictment—and violates the Fifth Amendment—when it "broadens the possible bases for conviction beyond those presented by the grand jury." *Id.* (cleaned up).

Here, the grand jury charged Sessum and Okomba with a fraudulent debt-collection scheme by use of wire communications. The indictment referred to the use of email as part of that scheme. J.A. 26 (charging Sessum and Okomba with causing the transmission of wire communications, "including interstate phone calls and emails"). So the district court's response (that emails are wire communications under § 1343) didn't broaden the potential bases of Sessum and Okomba's convictions. That was the precise theory the grand jury presented. We thus reject the defendants' constructive-amendment claim.

19

D.

Okomba lastly challenges the district court's denial of her severance motion. We review that ruling for abuse of discretion. *United States v. Min*, 704 F.3d 314, 319 (4th Cir. 2013). "If two defendants are properly indicted together, courts generally adhere to the principle that defendants indicted together should be tried together."[8] *United States v. Young*, 989 F.3d 253, 266 (4th Cir. 2021) (cleaned up). And "[j]oinder is highly favored in conspiracy trials." *United States v. Lawson*, 677 F.3d 629, 639 (4th Cir. 2012).

But if a joint trial would prejudice a defendant, a court may order a separate trial. Fed. R. Crim. P. 14(a). "Demonstrating prejudice is a high hurdle." *Young*, 989 F.3d at 266. It requires a defendant to show "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (cleaned up).

On appeal, Okomba doesn't argue that the joint trial compromised any specific trial right. She instead claims evidence of Sessum's "debt collection fraud in connection with a prior company" prejudiced her. Appellants' Br. at 55. According to Okomba, this evidence "clearly spilled over," as the verdict reflects. *Id.*

But the government never used evidence of Sessum's previous fraudulent practices. It moved in limine to admit such evidence but took no further action on it at trial. So the district court didn't err in denying the motion to sever.

---

[8] Okomba doesn't contest the initial joinder of the charges.

IV.

Sessum and Okomba also challenge the procedural and substantive reasonableness of their sentences. On procedural reasonableness, Okomba asserts the district court erred by applying role enhancements, miscalculating the loss amount attributable from the fraudulent scheme, and inadequately explaining her sentence. Sessum joins her on the loss-amount issue.

We review all sentences "under a deferential abuse-of-discretion standard." *United States v. Torres-Reyes*, 952 F.3d 147, 151 (4th Cir. 2020) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). To determine whether a sentence is procedurally reasonable, we "consider[] whether the district court properly calculated the defendant's advisory guidelines range, gave the parties an opportunity to argue for an appropriate sentence, considered the 18 U.S.C. § 3553(a) factors, and sufficiently explained the selected sentence." *Id.* (cleaned up). When reviewing whether a court properly calculated the Guidelines range, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018).

Finding no error, we affirm Sessum and Okomba's sentences.

A.

Okomba contends that the district court erred in applying a three-level sentencing enhancement for her aggravating role in the wire-fraud conspiracy. She says the district court should have instead applied a reduction for her minor role. We disagree.

Under the Guidelines, if a defendant was "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was

21

otherwise extensive," a three-level increase is appropriate. U.S.S.G. § 3B1.1(b). A "participant" must be "criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1 cmt. n.1. "A sentencing court's ruling on the aggravating role adjustment is a factual determination," which we review for clear error. *United States v. Llamas*, 599 F.3d 381, 389 (4th Cir. 2010) (cleaned up).

1.

Okomba first argues that the district court erred in applying the three-level enhancement because the conspiracy didn't involve at least five participants and wasn't otherwise extensive. Because we find the district court didn't clearly err in finding the conspiracy was extensive, we don't reach whether the conspiracy had at least five participants.

In assessing whether an organization is "otherwise extensive," we consider "all persons involved during the course of the entire offense," including nonparticipants who offered "unknowing services." U.S.S.G. § 3B1.1 cmt. n.3. We also examine "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *United States v. Beverly*, 284 F. App'x 36, 41–42 (4th Cir. 2008) (cleaned up) (collecting cases).

Here, there were at least three participants and many outsiders who may have unknowingly assisted in the wire-fraud conspiracy. Sessum, Okomba, and Hough were all convicted (and thus "criminally responsible") for conduct arising out of Direct Processing's debt-collection scheme, qualifying as "participants" under the Guidelines. *See* U.S.S.G. § 3B1.1 cmt. n.1.

22

Direct Processing's scheme also involved a team of collection employees who defrauded victims to the tune of $6.1 million over three years. And Direct Processing engaged the services of various outside vendors, such as dialing services and banks, to further its scheme. So even if those outside the conspiracy had no knowledge that they were assisting criminal activity, the district court didn't clearly err in finding the conspiracy extensive.

2.

Okomba next claims that there was "simply no evidence in the record" to support the district court's finding that she was a "manager or supervisor" under § 3B1.1(b)'s enhancement. Appellants' Br. at 38. Such a finding is "appropriate where the evidence demonstrates that the defendant controlled the activities of other participants or exercised management responsibility." *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011) (cleaned up).

The district court's conclusion that Okomba was a manager or supervisor of the scheme wasn't clearly erroneous. After all, she was the registered agent of Direct Processing, a signatory to its primary bank account, and a person with access to its brokerage account. Most importantly, employees identified Okomba as the company's office manager and co-owner who oversaw collection employees, and one employee told the jury Okomba fired her. That's enough to satisfy our review, even accepting (as Okomba says) that she didn't recruit Sessum or Hough into the conspiracy.

3.

Okomba also challenges the court's refusal to apply a minor-role reduction under U.S.S.G. § 3B1.2. A defendant is entitled to the reduction "if she is 'substantially less culpable than the *average participant in the criminal activity.*'" *United States v. Carbajal*, 717 F. App'x 234, 240 (4th Cir. 2018) (quoting U.S.S.G. § 3B1.2 cmt. n.3).

Our discussion of the district court's ruling on the "manager or supervisor" enhancement resolves this claim. As we've noted, Okomba played a key role in opening and operating Direct Processing, and she managed its day-to-day collection activities. Okomba stood to substantially benefit from Direct Processing's collections—even if not as much as Sessum—and had access to its bank accounts. That Okomba didn't develop the scripts or teach anyone how to collect debts doesn't overcome the evidence that she ensured employees used Direct Processing's fraudulent tactics.

B.

Sessum and Okomba argue that the district court erred in calculating the $6.1 million loss amount it used to apply an 18-level enhancement to their offenses. *See* U.S.S.G. § 2B1.1(b)(1)(J). They claim that the court's failure to state whether it based its calculation on the actual or intended loss renders the result speculative. And the court erred, Sessum and Okomba say, by refusing to reduce the loss amount by collections returned to debtors. Okomba also complains that the court ignored that she distanced herself from Direct Processing after the FBI searched the Sardis Road office. She says that separation should have reduced her loss amount. We reject these arguments.

24

We review the district court's determination of the loss amount for clear error. *United States v. Cloud*, 680 F.3d 396, 409 (4th Cir. 2012). In reviewing the court's determination, we're mindful that it "need only make a reasonable estimate of the loss." *Id.* (cleaned up).

At trial, the government presented testimony from an FBI forensic accountant and documentary evidence that tied over $6.1 million in collections to Direct Processing's scheme. Employees and victims testified that Direct Processing first contacted victims with false threats of legal action if they didn't pay their purported debts. This evidence adequately supports the district court's finding that all of Direct Processing's collections were illegitimate from the start, so the court could treat the full $6.1 million as the loss amount.

We easily dispose of Sessum and Okomba's argument premised on the district court's failure to specify whether it calculated the actual or intended loss amount. That's because, under the Guidelines, the loss amount "is the *greater* of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A) (emphasis added). The district court's failure to specify exactly the type of loss it found is of no moment given that its calculation is otherwise supported by the record.

And even assuming the district court erred by failing to reduce the loss amount by any collections refunded to debtors over the course of the conspiracy, such error was harmless. During the scheme, Direct Processing returned about $565,000 to debtors

through "charge backs."[9] Had the court reduced the $6.1 million loss amount by that figure, the loss would still be well above the $3.5 million threshold required for the 18-level enhancement. *See United States v. Dowell*, 771 F.3d 162, 175 (4th Cir. 2014) ("Sentencing error is harmless if the resulting sentence is not longer than that to which the defendant would otherwise be subject." (cleaned up)).

As for Okomba's claim that her loss amount should be reduced given her limited involvement in Direct Processing after the FBI's first search, we're not persuaded. For even after the search, Okomba continued to sign financial documents on behalf of Direct Processing. *See* J.A. 845, 858. So she never fully withdrew from the conspiracy. We think the district court reasonably attributed at least $3.5 million in loss to Okomba given her "role in the conspiracy, her knowledge, [and] the reasonable foreseeability of the loss with respect to her." J.A. 1351.

We thus affirm the district court's calculation of Sessum and Okomba's loss amount and its application of the 18-level enhancement under § 2B1.1(b)(1)(J).[10]

---

[9] A "charge back" occurs when a debtor doesn't "want to finish with the payment," so the credit card company reverses the charge. J.A. 495, 910.

[10] It's not clear that Sessum and Okomba challenge the district court's restitution orders, but that contention fails all the same. They argue only that "none of the required findings were made." Appellants' Br. at 46. Before a court may order restitution, it must direct "the probation officer to obtain and include in its presentence report . . . information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a). Both Sessum's and Okomba's reports contained this information. And neither defendant objected when the district court adopted the reports' restitution amount. We see no reason to disturb the court's finding.

C.

Okomba also claims that the district court erred by failing to adequately respond to her mitigating arguments or explain the sentence that it imposed.[11] She argues that the district court failed to address why the § 3553(a) factors didn't warrant the probationary sentence she requested. And the court, Okomba says, disregarded that she "was much less culpable than Sessum." Appellants' Br. at 50. Again, we disagree.

A district court must "adequately explain [its] chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. A court's explanation is sufficient if it, even if "somewhat briefly, outlines the defendant's particular history and characteristics not merely in passing or after the fact, but as part of its analysis of the statutory factors and in response to defense counsel's arguments for a downward departure." *United States v. Lozano*, 962 F.3d 773, 782 (4th Cir. 2020) (cleaned up).

Here, the district court explained why it rejected Okomba's request for a probationary sentence. Addressing "the seriousness of the offense," the court pointed to "Okomba's extended role in [the offense], her financial gain from it, her employment in the criminal organization, . . . [and] her owner/manager role." J.A. 1373. The court also noted identified that Okomba's criminal conduct exploited a "vulnerable" population, and

---

[11] The opening brief fails to meaningfully challenge the district court's explanation of Sessum's sentence, so that issue is waived. *See United States v. Caldwell*, 7 F.4th 191, 207 n.13 (4th Cir. 2021) (finding arguments waived where the appellant raised the issue only "[i]n headings, his statement of issues, and an introductory sentence in his brief").

when confronted by the FBI, Okomba lied to agents, hoping to obstruct the investigation. J.A. 1373–74.

Yet the district court still imposed a below-Guidelines sentence. It varied down from a low-end Guidelines recommendation of 121 months to impose a 72-month sentence. In doing so, it acknowledged a variance was warranted because Okomba ceased her criminal activity before her coconspirators did—like she argued. And this variance reflected the court's desire to "avoid unwarranted sentencing disparit[ies]" and a "diminished" need to protect the public. J.A. 1374–75.

We're satisfied that the district court considered Okomba's arguments and had a "reasoned basis for exercising its own legal decisionmaking authority." *Lozano*, 962 F.3d at 782 (cleaned up).

D.

Finally, Sessum and Okomba contend that their sentences are substantively unreasonable. On this issue, we look at "the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Arbaugh*, 951 F.3d 167, 176 (4th Cir. 2020) (cleaned up). We presume that Sessum and Okomba's sentences are substantively reasonable because each is below its respective Guidelines range. *United States v. Gutierrez*, 963 F.3d 320, 344 (4th Cir. 2020). So they can only rebut this presumption by showing that their sentence is unreasonable when measured against the statutory sentencing factors. *Id.*

28

Sessum argues his sentence is substantively unreasonable because it created unwarranted sentencing disparities between him and his coconspirators who pleaded guilty. And Sessum suggests the court penalized him for trying his case. He's wrong on both counts.

The district court examined the differences between Sessum's and the other coconspirators' sentences, finding any disparity was "justified and wholly appropriate." J.A. 1334. Sessum's coconspirators accepted responsibility for their conduct and cooperated with the government. Sessum, on the other hand, obstructed law enforcement's investigation into his criminal conduct and displayed a lack of remorse. And as much as he reiterates that the court "grossly inflated" his loss amount, *see* Appellants' Br. at 54, the district court varied downward to address that concern. Like the district court, we find that Sessum's sentence reflects his conduct, not his decision to go to trial.

Okomba's contentions similarly fail. She claims that the district court failed to properly account for the nature and circumstances of her offense and avoid unwarranted sentencing disparities. But as we discussed, the court correctly accounted for Okomba's substantial role in the scheme. The court thus rightly rejected her request for a probationary sentence because it would fail to recognize the seriousness of her offense.

Yet the court also acknowledged that Okomba ended her criminal activity before other coconspirators. So it varied downward. Okomba offers no persuasive reason why we should reject the district court's below-Guidelines sentence.

## V.

For the reasons given, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*